1

2

3                    UNITED STATES DISTRICT COURT

4                  NORTHERN DISTRICT OF CALIFORNIA

5                          OAKLAND DIVISION

6

7    JUAN MENDEZ,

8              Petitioner,                    No. C 10-5555 PJH (PR)

9       vs.                                   **ORDER DENYING PETITION
                                              FOR WRIT OF HABEAS
10   MARTIN D. BITER, Warden,                 CORPUS AND GRANTING
                                              CERTIFICATE OF
11             Respondent.                    APPEALABILITY**
     _____/
12

13          This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. §

14   2254.  The court ordered respondent to show cause why the writ should not be granted.

15   Respondent has filed an answer and a memorandum of points and authorities in support of

16   it, and has lodged exhibits with the court.  Petitioner has responded with a traverse.  For

17   the reasons set forth below, the petition is denied.

18                              **BACKGROUND**

19          Petitioner was convicted by a jury on multiple charges including, six counts of

20   assault by means likely to produce great bodily injury, two counts of dissuading a witness

21   by force or threat, one count of aggravated trespass, three counts of violating a protective

22   order, one count of attempted premeditated murder, one count of threat of violence, and

23   one count of battery on a cohabitant.  He was sentenced to fourteen years in prison.

24   The California Court of Appeal affirmed his conviction and the California Supreme court

25   denied his petition for review.

26   ///

27   ///

28   ///

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    The following facts are excerpted from the opinion of the California

2  Court of Appeal:

3    A.    The prosecution case

4    Matilda Mireles, a 31-year-old undocumented alien, had been in the United
     States for approximately 11 years at the time of trial.  Prior to coming to the
5    United States from Mexico, Mireles had not completed elementary school.
     Though she was attending school in this country, she could not read or write
6    in either English or Spanish. While in the United States, Mireles married
     Joseph Villalobos, with whom she had two daughters. They divorced in 2004,
7    and Mireles testified that there was domestic violence in her relationship with
     Villalobos. Mireles also admitted that she was abused as a child.
8
     Mireles met [petitioner] at a friend's wedding in 2005, and the two became
9    friends, talking on the phone once a week. At the time, Mireles was dating
     another man. A few months later, [petitioner] learned that she had a boyfriend
10   when he came to visit Mireles at her uncle's house. [Petitioner] slapped her,
     called her a "whore," and "many bad things." Mireles told him she no longer
11   wanted to be his friend after that and stopped answering his phone calls.

12   About five or six months later, Mireles began speaking to [petitioner] again
     after he asked for her forgiveness and promised to never hit her again. Soon
13   afterwards, [petitioner] accompanied Mireles to the bus stop one day. A
     passing car honked and Mireles turned to see who it was. [Petitioner] again
14   slapped Mireles and called her a whore and a prostitute. Mireles called the
     police, who took her home. She remained friends with [petitioner], only
15   because he insisted. [Petitioner] also said that Mireles should forgive him,
     saying it was "[her] fault because [she] was seeing other men."
16
     [Petitioner] knew that Mireles was undocumented, and he obtained fake
17   identification for her, with the name "Bertha DeLaCruz," as well as a job at the
     packing company where he worked. [Petitioner] also helped Mireles get an
18   apartment, filling out the paperwork and allowing her to use his credit. Mireles
     paid for the credit check, the deposit and the rent, however. [Petitioner] gave
19   Mireles the key to the apartment and helped her move in on June 19, 2006.

20   Approximately two weeks later, [petitioner] moved into the apartment as well,
     though Mireles did not want him to do so. Mireles was home when she heard
21   someone coming in the door. [Petitioner] was carrying his belongings inside
     and when she protested that the agreement was that she would have the
22   apartment to herself, [petitioner] laughed at her. Mireles did not complain to
     anyone because [Petitioner] threatened to tell her ex-husband and her social
23   worker that he was her lover.

24   On July 15, 2006, a Saturday, one of Mireles's female friends called and
     invited her to a party. Although Mireles was afraid that [petitioner] would get
25   angry at her for going, she decided to go anyway. Mireles went to take a
     shower, and [petitioner] came into the bathroom. Mireles was taking off her
26   shirt, and [petitioner] was upset and asked where she was going. He said that
     Mireles had a hickey on her neck and arm and called her a whore and a bitch.
27   She denied having any hickeys, but [petitioner] said she was going to "go out
     and whore around on the street." He then punched her in the face.
28

2

[Petitioner] hit her with a closed fist many times. He grabbed her by the hair and hit her head twice against the bathroom wall. Mireles got dizzy and fell to the floor, but [petitioner] picked her up and hit her very hard on the ear. Mireles put her hands up to block his punches, and unintentionally scratched [petitioner] around his eye. She realized what she had done when she saw blood on [petitioner]'s face.

[Petitioner] stopped beating Mireles, looked in the mirror and began laughing. He said he was going to call the police and accuse her of domestic violence. [Petitioner] also said he would call her employer and the police, and then Mireles could not get custody of her daughters because she was a violent person. Mireles got very scared, and asked [petitioner] to forgive her. [Petitioner] hugged and kissed her, and said that he would not say anything, but that she should not say anything about him hitting her.

When Mireles said that she still wanted to go to the party with her friend, [petitioner] began hitting her again, telling her she could not go and that if she continued to misbehave, he would kill her. Mireles took the threat seriously because [petitioner] was angry. [Petitioner] threw her to the floor, sat on her and began to choke her with both hands. Though Mireles could breathe, the choking made her cough and want to vomit. Mireles was crying and yelling, and [petitioner] went to the living room. She asked him to help her, and to call an ambulance.

Mireles called 911 from the bedroom, and [petitioner] came back into the room and asked what she was doing. She said she was calling the police because she felt bad and her head hurt. [Petitioner] told Mireles it would be bad for her to call the police, and said she should not use her real name. While she was on the phone, [petitioner] was telling her what to say to the police. The police asked Mireles what the emergency was, and at [petitioner]'s direction, she said there was a couple fighting in the street. When the police asked Mireles if the couple was still there, [petitioner] told her to say that they had left.

After Mireles ended the call, [petitioner] hit her again. He threw her to the ground, took a rolled-up pillow and held it against her throat so she could not breathe. Mireles vomited blood and briefly lost consciousness. [Petitioner] became frightened and started crying. He said that he did not want to kill her, and asked Mireles to forgive him. [Petitioner] told her he would call an ambulance, but she should say whatever he told her to say. [Petitioner] called 911 and gave fake names for himself and Mireles, then said that Mireles had tried to kill herself. Mireles did not tell the police or paramedics what had really happened. [Petitioner] was always standing nearby when she being treated.

Mireles does not remember leaving the hospital, but remembers waking up in her apartment on Monday. Though her head still hurt and she was very confused, she went to school. After school, Mireles went to her friend Erma's house and told her what had happened. Mireles then called the police. Officer Heath Johnson, with the Salinas Police Department, arrived to take a report. As Officer Johnson did not speak Spanish, Erma's younger sister volunteered to translate. Mireles was not comfortable talking to the officer with the younger sister translating, because the girl was young, and did not know what was going on. Mireles also did not think that Officer Johnson understood what she was saying because when she said something about what happened, he

3

accused her of lying. She also felt that Erma's sister was not translating very well because she was made nervous by Officer Johnson calling Mireles a liar.

Officer Johnson took Mireles and Erma's sister to the apartment to look for [petitioner], where they were met by another Salinas police officer named Rios. Officer Johnson went upstairs to the apartment to speak with [petitioner] while Officer Rios and the two women remained downstairs. When Officer Johnson returned, he told Officer Rios that Mireles was a liar. After this, Mireles no longer wanted to talk to Officer Johnson since he did not believe her. Mireles stayed at Erma's place that night, and the next day, Erma helped her obtain a restraining order against [petitioner]. Mireles returned to the apartment, changed the lock and got two new keys.

[Petitioner] was served with the restraining order on July 28, 2006. After that, he called Mireles many times and threatened her, saying that if she did not remove the restraining order, she would "be sorry."

On August 12, 2006, [petitioner] pushed his way into Mireles's apartment and took one of her apartment keys. Mireles told him to leave, but [petitioner] sat on the sofa laughing at her. She went to the kitchen to call the police, but [petitioner] followed her and disconnected the telephone. Mireles got her cell phone from her purse, and again told [petitioner] to leave or she would call the police. [Petitioner] again laughed and said he was not afraid of going to jail. She began dialing 911, and [petitioner] ran out.

On one other occasion, [petitioner] tried to enter the apartment by climbing onto the balcony. He put his face against the sliding glass door and told Mireles to let him in. When Mireles refused, [petitioner] pulled on the door handle, but it was locked. Mireles called the police, and [petitioner] left.

On the night of September 18, 2006, [petitioner] entered Mireles's apartment while she was asleep. He dropped on top of her, pinning her hands and legs. Without saying a word, [petitioner] put one hand on her neck, grabbed a cushion with his other hand and placed it over her face. He then pressed down with both hands on the cushion, and Mireles could not breathe or move. She lost consciousness briefly. Mireles recalled [petitioner] getting up to close the front door which he had left open, and when he did so, she grabbed her cell phone to call the police. [Petitioner] charged over to where she lay on the floor, grabbed the phone and broke it. He told Mireles that he was going to kill her and again put the cushion over her face, pressing down hard. Mireles fainted or lost consciousness a second time.

When she came to, she began screaming loudly for help, as she believed [petitioner] would kill her. [Petitioner] again told Mireles he was going to kill her and that she would never see her daughters again. He hit her in the face and on the head with his closed fist, giving her a bloody nose. Mireles was able to get up and she ran to the bedroom, opened the window and screamed for help. [Petitioner] grabbed her, covered her mouth and told her to be quiet. He called her a whore and a dog, and accused her of being "with a lot of men."

[Petitioner] dragged Mireles back into the living room, still covering her mouth. Mireles bit his hand, and [petitioner] punched her in the face. He threw her to the floor and covered her mouth with his hands. Mireles lost consciousness for a third time. She believes that while she was unconscious this time, [petitioner] used a

4

**United States District Court**
For the Northern District of California

When she awoke, [petitioner] was in front of her, telling her that he loved her very much. As he spoke, [petitioner] was squeezing Mireles's throat. [Petitioner] stood, went into the kitchen and got a knife. He poked Mireles in the chest with the knife, right beneath her breast. The point of the knife broke the skin and Mireles bled slightly. While still holding the knife in one hand, [petitioner] began squeezing Mireles's throat with his other hand, continuing to tell her that he would kill her. Mireles was crying, and then heard someone coming up the stairs. There was a knock on the door, and someone called, "Open up." [Petitioner] told Mireles to stay quiet. He went to the kitchen, left the knife there, then went to open the door.

Officer Brian Canaday, City of Salinas Police Department, and other officers had responded to a telephone call from one of Mireles's neighbors. When he arrived at the apartment complex, he could hear a male yelling and a female screaming and crying. As Officer Canaday and the other officers approached Mireles's apartment, he could still hear a male yelling and a woman crying. He knocked on the door, and it got quiet in the apartment. There was a pause, and [petitioner] opened the door, breathing very heavily and sweating profusely. Officer Canaday noticed that [petitioner]'s hands were bloody, and there was blood on his shirt, pants and socks. Officer Canaday saw Mireles on the living room floor, crying and sobbing, with blood on her face. [Petitioner] looked at the officers and said nothing. Officer Canaday pushed [petitioner] into the apartment and searched him for weapons while the other officers made contact with Mireles.

Another officer found the knife [petitioner] had used on Mireles, and Officer Canaday immediately put [petitioner] in handcuffs. [Petitioner] told Officer Canaday that Mireles has a "condition that makes her bleed." As the other officers spoke with Mireles, Officer Canaday noticed that [petitioner] was looking at her in an intimidating way, so he took [petitioner] outside the apartment. Officer Canaday searched [petitioner] and found a broken cell phone in his left rear pocket.

Mireles was transported to the hospital, where she told medical personnel what had happened. She had bruises on her arms and throat for two weeks, as well as pain in her jaw and ear.

Christina Gonzalez, who called the police that night, and her brother, Jose Gonzalez, who lived in an adjoining apartment, could hear a woman crying next door. Jose Gonzalez testified that he could hear a woman crying for help and told his sister, Christina, to call 911. Before she called, Christina also heard a woman crying, "Leave me alone, leave me alone. I'm already tired of you hitting me."

The apartment building's resident maintenance man, Geronimo Villasenor, heard sounds of people fighting from Mireles's apartment on at least two occasions and once heard what sounded like someone being thrown into a wall. On another occasion, he heard a male voice yelling "Shut up, bitch, stupid" and "I'm going to kill you." Villasenor changed the locks on Mireles's apartment twice, and the first time he did so, he noticed that she had bruises.

Patricia Overburg, executive director of the Crisis Center in Salinas, testified as an expert on Battered Woman's Syndrome (BWS) and "intimate partner battering." She explained the general pattern involved in "intimate partner battering," which begins with a sense of being in love and happy, but then

suddenly one partner becomes violent or angry. It can begin with verbal and mental abuse, and progresses to physical violence. She noted that victims develop low self-esteem and sometimes feel at fault for their own abuse. The abuser then apologizes and promises it will not happen again. There is then a "honeymoon period," during which the abuser is kind to the victim, taking him or her to dinner and movies, and buying flowers for the victim. Eventually, the cycle begins again, and over time, the "honeymoon period gets shorter and shorter." The abuser sees the victim as "property," and uses violence as a means of controlling this "property."

B.    The defense case

Bertha DeLaCruz testified that she had lived in a house with Mireles's former mother-in-law for a few months in 1996. When she moved out, DeLaCruz was unable to find a fake social security card with her name on it, and presumes she left it at the house. DeLaCruz had never worked at the packing company where [petitioner] and Mireles worked, and she did not know [petitioner].

Officer Johnson testified that he responded to the domestic violence call made by Mireles on July 17, 2006. He did not observe any injuries on Mireles's body or face. Officer Johnson believed that Mireles was untruthful and documented that in his report. He formed that opinion after speaking with [petitioner], then reinterviewing Mireles. [Petitioner] told Officer Johnson that Mireles had scratched him and that he was the victim. Officer Johnson felt that Mireles was untruthful because she first said that [petitioner] slapped her, then said that he punched her, and then that he choked her. The officer believed that Mireles kept escalating what had happened when it appeared that "she wasn't going to get her way."

[Petitioner] did not testify.

Petition, Ex. A at 1-9 (footnotes omitted).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, (2000), while the second prong applies to decisions based on factual determinations, *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

6

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  "[E]valuating whether a rule application [i]s unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.*  "As a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El*, 537 U.S. at 340.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

7

1

**DISCUSSION**

2        As grounds for federal habeas relief, petitioner argues that:

3        (1) the trial court's exclusion of testimony from two witnesses violated his right to

4    present a complete defense;

5        (2) improper contact between a juror and an investigator for the defense caused him

6    to compromise his trial tactics;

7        (3) incomplete and inaccurate trial transcripts resulted in a violation of his right to

8    due process on appeal; and

9        (4) his trial and appellate counsel were ineffective under *Strickland v. Washington*,

10   466 U.S. 668 (1984).

11   **I.     Right to Present a Defense**

12       Petitioner contends that his right to present a defense was violated when the court

13   excluded two witnesses, Joseph Villalobos and Jessica Moncada, that could have

14   addressed the credibility of the complaining witness, Mireles.  Specifically, petitioner alleges

15   that their testimony would have brought attention to the history of false claims made by the

16   complaining witness against them in court proceedings.

17       **A.     Standard**

18       "The Constitution guarantees criminal defendants 'a meaningful opportunity to

19   present a complete defense.'"  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)

20   (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).  The constitutional right to present

21   a complete defense includes the right to present evidence, including the testimony of

22   witnesses.  *Jackson v. Nevada*, 688 F.3d 1091, 1096 (9th Cir. 2012).  But the right is only

23   implicated "when the evidence the defendant seeks to admit is 'relevant and material, and . 

24   . . vital to the defense.'"  *Id.*  Additionally, a violation of the right to present a defense does

25   not occur any time such evidence is excluded, "but rather only when its exclusion is

26   'arbitrary or disproportionate to the purposes [the exclusionary rule applied is] designed to

27   serve.'"  *Id.* (citation omitted).  This is true even if the rule under which it is excluded is

28   respected, frequently applied and otherwise constitutional.  *Id.*  "If the 'mechanical'

United States District Court

For the Northern District of California

1   application of such a rule would 'defeat the ends of justice,' then the rule must yield to those

2   ends." *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).  Thus, where a

3   state criminal defendant asserts that the exclusion of evidence at trial violated his right to

4   present a defense, a federal habeas court must consider the value of the evidence in

5   relation to the purposes purportedly served by its exclusion to determine whether a

6   constitutional violation has occurred.  *Id.* at 1097.

7       A violation of the right to present a defense merits habeas relief only if the error was

8   likely to have had a substantial and injurious effect on the verdict.  *Jackson*, 688 F.3d at

9   1104 (citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993)).

10      **B.      Analysis**

11      The California Court of Appeal set forth the facts relevant to this claim as follows:

12      [Petitioner] argues that the court erred in excluding the testimony of two
       witnesses, Joseph Villalobos and Jessica Moncada, he intended to call at
13      trial. He claims these two witnesses would have directly challenged Mireles's
       credibility as they would have testified regarding previous false charges
14      Mireles had made against them in court proceedings. [Petitioner] contends
       that their exclusion violated his constitutional right to present a complete
15      defense.

16      *A.      Excluded testimony*

17      [Petitioner] brought motions in limine to allow the testimony of Villalobos,
       Mireles's ex-husband, and Moncada. [Petitioner] advised the trial court that
18      Villalobos would testify that, during their "family law/child custody case,"
       Mireles had accused Villalobos of molesting their children and these
19      "accusations ... were never proven to be true."

20      With respect to Moncada, [petitioner] stated that Mireles had unsuccessfully
       sought a restraining order against Moncada for allegedly trying to harm
21      Mireles and/or her children. However, according to her declaration, Moncada
       was in the hospital at the relevant time.
22
       The People moved to exclude the testimony of both witnesses.  At a pretrial
23      hearing on the parties' in limine motions, [petitioner] argued that Villalobos
       and Moncada would offer impeachment testimony which would be relevant to
24      Mireles's credibility. Their testimony would also show Mireles's "willingness to
       use the Court system in a way to get what she wants."
25
       With respect to Villalobos's testimony, the People argued that the children,
26      not Mireles, had accused Villalobos, and since Mireles's declaration in the
       dependency proceeding was based on the children's accusations, it could not
27      be perjury. The People also objected that Villalobos's testimony would involve
       hearsay and privileged material from the dependency proceedings. Allowing
28      his testimony would result in a time-consuming foray into a contentious

divorce and custody battle possibly necessitating recalling Mireles and the daughters to testify about the accusations of molestation and physical abuse.

As to Moncada's testimony, the People argued that she was Villalobos's niece and had nothing significant to offer, other than Mireles's failed attempt to get a restraining order.

The trial court made a preliminary ruling that Villalobos could not testify as to what court officials may have said, but reserved ruling on his specific testimony. It warned counsel that it did not intend to retry "the family matter or the dependency," but that the parties, i.e., Villalobos and Mireles, could describe any incidents that occurred between themselves. With respect to Moncada, the trial court indicated that she could not testify as to the outcome of Mireles's application for a restraining order, as it would be hearsay, but again reserved its ruling as to her specific testimony.

On April 27, 2007, three days before trial commenced, [petitioner] elaborated on his offer of proof as to Moncada, stating that Mireles had sought a protective order against Moncada, claiming Moncada had "threatened her and used her vehicle in an attempt to 'run her down .' " Moncada would testify that this could not have happened, because on the day in question, Moncada was under a doctor's orders not to drive.

On the first day of trial Mireles was cross-examined regarding the accusations she made against Moncada. Mireles was asked if she had ever told a judge that Moncada had tried to run her over and had tried to take her children. Mireles responded that she had done so and further said that these accusations were true.

A few days later, the trial court ruled that Villalobos could not testify about his "ongoing family feud," including the molestation and abuse accusations made against him. His testimony was excluded pursuant to Evidence Code section 352 as "misleading, likely to confuse the jury, and any relevancy by any undue consumption of time [sic ]."

The trial court also excluded Moncada's testimony. In making its ruling the trial court noted that, before trial, it was under "the impression [Moncada] was in the hospital" on the day Mireles claimed she tried to run her over, "and that's why I was allowing her to testify." Instead, Moncada "was ordered to be on bed rest which doesn't necessarily preclude her from being out and about." [Petitioner] responded that Moncada "had an emergency C-section on June 9th, 2005 and [was] ordered not to drive until June 23, 2005 and did not drive until after that date." The trial court noted that there was "a big [difference] from being in the hospital" to being under a doctor's orders not to drive. The court excluded the testimony "under Evidence [Code section] 352, and the fact that there's not a [sic ] clear evidence to show that she was not able to drive as compared to being in the hospital, ... we are going to get down in to the plain old he said she said type [of] thing and that will be an undu[e] consumption of time, [and] confuse the jury."

Petition, Ex. A at 10-13.

///

The California Court of Appeal cited several cases in which the prior accusations of

10

United States District Court

For the Northern District of California

1  the testifying witnesses were similar, and were either discovered to be false or established

2  that the witnesses had developed a confirmable reputation of dishonesty.  The court noted

3  that the prior accusations in this matter were not similar and there was a possibility of a

4  dispute about its falsity.  The court held that the excluded witnesses' testimony denying the

5  accusations would not be conclusively compelling and would waste the court's resources

6  because the court would essentially be retrying subsidiary issues dealing with dependency

7  hearings and family matters.  Furthermore, the court noted the overwhelming evidence and

8  other witnesses' testimony corroborated Mireles trial testimony.  The state court rejected

9  petitioner's claim that the exclusion of the two witnesses violated his right to present a

10  defense.

11  *B.    Standard of review*

12  Evidence Code section 352 provides as follows: "The court in its discretion
    may exclude evidence if its probative value is substantially outweighed by the

13  probability that its admission will (a) necessitate undue consumption of time
    or (b) create substantial danger of undue prejudice, of confusing the issues,

14  or of misleading the jury." Such an exercise of discretion shall not be
    disturbed on appeal absent a showing that such discretion was exercised in

15  an arbitrary, capricious or patently absurd manner that resulted in a manifest
    miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060,

16  1124-1125.) " '[T]he latitude [Evidence Code] section 352 allows for exclusion
    of impeachment evidence in individual cases is broad. The statute empowers

17  courts to prevent criminal trials from degenerating into nitpicking wars of
    attrition over collateral credibility issues.' " (*People v. Ayala* (2000) 23 Cal.4th

18  225, 301.)

19  *C.    The trial court properly excluded the testimony of Villalobos and Moncada*

20  [Petitioner]'s reliance on *People v. Burrell-Hart* (1987) 192 Cal.App.3d 593
    *(Burrell-Hart )*, *People v. Wall* (1979) 95 Cal.App.3d 978 (Wall ), *People v.*

21  *Adams* (1988) 198 Cal.App.3d 10 (*Adams* ), and *People v. Randle* (1982) 130
    Cal.App.3d 286 *(Randle)*, is misplaced.

22

23  In *Burrell-Hart*, the defense wanted to prove that the complaining witness had
    a history of making false allegations of rape or attempted rape. The witness

24  alleged that sometime after she had a disagreement with defendant at the bar
    where they both worked, defendant went to her home and beat her and raped

25  her. *(Burrell-Hart, supra,* 192 Cal.App.3d at p. 596.) The accusation against
    the defendant was strikingly similar to an accusation the witness had made to

26  a coworker about another man just a few days or weeks before. (*Ibid.*) The
    witness confirmed the substance of the accusation at the time of trial but

27  denied having told the coworker about it. (*Id.* at p. 598.) The appellate court
    considered the evidence particularly probative given the similarity between

28  the two allegations. (*Id.* at p. 599.) In addition, since the coworker would
    testify to what the witness had told her, the evidence also established a prior

1   inconsistent statement by the witness. (*Id.* at p. 598.)

2   In *Wall*, *supra*, 95 Cal.App.3d 978, defense counsel represented that the
3   victim's ex-boyfriend would testify that she once threatened to falsely accuse
    him of rape. (Id. at p. 983.) The court allowed the testimony but later
4   erroneously struck it and advised jurors to disregard it because the court
    believed that the prior instance of the victim's conduct was not admissible to
5   impeach her credibility. (*Ibid.*) On appeal, the court held that in a rape
    prosecution, specific instances of nonsexual conduct are admissible to
    impeach credibility if they have a tendency to disprove the truthfulness of a
6   witness's testimony. (*Id.* at ¶. 984-989.)

7   In *Adams*, *supra*, 198 Cal.App.3d 10, the defense sought to establish that the
    victim agreed to have sex with the defendant in exchange for drugs, but when
8   the defendant reneged on their arrangement, she accused him of rape. (*Id.* at
    p. 16.) In support of this theory, the defense proffered evidence that the victim
9   had previously falsely accused someone of rape, but that evidence was
    excluded. (*Ibid.*) Because there were no eyewitnesses to the purported rape,
10  resolution of the case hinged upon the jury's assessment of the credibility of
    both the victim and the defendant. (*Id.* at p. 19.) Other defense witnesses had
11  testified that the victim had a "bad reputation" for being truthful. (*Id.* at p. 15.)
    The appellate court reversed, finding that the exclusion of the evidence was in
12  error. (*Id.* at p. 19.)

13  Finally, in *Randle*, *supra*, 130 Cal.App.3d 286, the victim testified that she met
    the defendant at a bar, they danced, and then he dragged her into the men's
14  room and forced her to orally copulate him. He said the act was consensual
    and denied using force. (*Id.* at ¶. 290-291.) In a brief discussion that does not
15  reveal defendant's offer of proof, the appellate court held that "[t]he trial court
    committed error in excluding testimony that on two prior occasions at the
16  same bar restaurant [the victim] had falsely complained of being a victim of
    purse snatch and of having been kidnapped. Evidence Code section 1103,
17  subdivision (a)(1), authorizes the admission of evidence of the alleged victim's
    character or trait of character-including evidence of specific acts-if offered by
18  the defendant to show prior conduct of the victim in conformity with such
    character or trait of character." (*Id.* at ¶. 295-296.)

19

20  In each of the cases described above, there was either no dispute that the
    prior accusations made by the victim were false, or that the victim had an
21  established, verifiable reputation of being dishonest. Furthermore, the prior
    accusations at issue in *Burrell-Hart*, *Adams* and *Wall* were so similar to the
22  accusations against the particular defendant in each of those cases that the
    similarity itself tended to support the contention that the accusations were
23  fabrications. In the instant case, the prior accusations are not similar, and
    there is at least some dispute about their falsity.

24  This case is more analogous to *People v. Tidwell* (2008) 163 Cal.App.4th
    1447 (*Tidwell*), where the defendant, accused of rape, sought to introduce
25  evidence that the victim had made prior false complaints of rape. The victim
    had never recanted those prior rape complaints, one of which involved an
26  unidentified assailant. (Id. at ¶. 1453-1454.) Defendant was able to locate and
    secure the presence in court of the alleged assailant from the other incident,
27  but that individual, at a hearing outside the presence of the jury, invoked his
    right to remain silent and was thus unavailable as a witness. (Id. at p. 1454.)
28  After discussing with counsel other means of introducing evidence of the

1   victim's prior rape complaints, including calling counselors, police officers, and
    others, the trial court excluded the evidence pursuant to Evidence Code
2   section 352. (*Tidwell*, supra, at p. 1454.) The appellate court affirmed, stating
    "inferences could be drawn either way from the circumstances of the prior
3   incidents and [the victim]'s statements concerning the incidents. In addition to
    the weaknesses in the evidence concerning falsity ..., admitting the evidence
4   would have resulted in an undue consumption of time as the defense
    attempted to bolster its view and the prosecution introduced evidence that
5   [one of the alleged assailants] had raped another female student." (*Id.* at p.
    1458.)
6
    In this case, Mireles's accusations against Villalobos and Moncada were not
7   at all similar to that which she claimed had occurred with [petitioner].
    Therefore, the value of the evidence as impeachment would depend entirely
8   upon proof that the accusations against Villalobos and Moncada were false.
    Villalobos and Moncada taking the witness stand and denying those
9   accusations would not constitute conclusive, let alone compelling, proof of
    their falsity. Consequently, the focus of the trial would shift to battles over the
10  subsidiary issues raised in the otherwise unrelated family law and
    dependency proceedings, as well as Mireles's efforts to obtain a restraining
11  order against Moncada. These battles would necessitate the consumption of
    considerable time, and divert the attention of the jury. (*See People v. Bittaker*
12  (1989) 48 Cal.3d 1046, 1097.) Further, the impeachment evidence would be
    subject to rebuttal by evidence (assuming there was any) that Villalobos and
13  Moncada did the things Mireles accused them of doing. (See *People v.
    Bothuel* (1988) 205 Cal.App.3d 581, 587-588, disapproved on other grounds
14  in *People v. Scott* (1994) 9 Cal.4th 331, 347-348.)

15  Even if we were to agree that Villalobos and Moncada should have been
    permitted to testify, we would conclude the error was harmless. [Petitioner]
16  presented a good deal of other evidence attacking Mireles's credibility, such
    as the testimony of Officer Johnson, as well as the ostensibly contradictory
17  testimony elicited from Mireles on cross-examination. Further, the
    prosecution's evidence against [petitioner] was strong and the outcome of the
18  case was not entirely dependent on Mireles's credibility, since her trial
    testimony was corroborated by several other witnesses and evidence. On this
19  record, it is not reasonably probable that a result more favorable to [petitioner]
    would have been reached had the trial court allowed Villalobos and Moncada
20  to testify. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

21  The trial court did not abuse its discretion in excluding this testimony pursuant
    to Evidence Code section 352, and the exclusion of the testimony did not
22  deprive [petitioner] of his constitutional right to present a complete defense.

23  Petition, Ex. A at 13-17.

24      As respondent notes, petitioner's claim is based on state law.  The state court

25  decision addressed the trial court's alleged error in the interpretation or application of Cal.

26  Evid. Code § 352.   Petitioner argues that the evidence was critical to the credibility of

27  Mireles, the victim and chief prosecution witness.  Thus, he claims it was fundamentally

28  unfair to exclude the evidence, or to uphold a determination of guilt without evidence of the

United States District Court

For the Northern District of California

1  two witnesses' testimony, which would have been offered to impeach Mireles' credibility.

2      Alleged trial court errors in the application of state evidentiary law are generally not

3  cognizable as grounds for federal habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 67–68

4  (1991) ("it is not the province of a federal habeas court to reexamine state-court

5  determinations on state-law questions").  "Trial court errors in state procedure and/or

6  evidentiary law do not rise to the level of federal constitutional claims warranting relief in a

7  habeas action, unless the error renders the proceeding so fundamentally unfair as to

8  deprive the petitioner of due process under the Fourteenth Amendment."  *McAdoo v. Elo*,

9  365 F.3d 487, 494 (6th Cir. 2004) (citing *Estelle v. McGuire*, 502 U.S. 62, 69-70, (1991)).

10      Although due process gives an accused the right to present a defense, "a

11 defendant's right to present relevant evidence is not unlimited, but rather is subject to

12 reasonable restrictions."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *See

13 Washington v. Texas*, 388 U.S. 14, 19 (1967).  A defendant "does not have an unfettered

14 right to offer [evidence] that is incompetent, privileged, or otherwise inadmissable under

15 standard rules of evidence."  *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (quoting *Taylor v.

16 Illinois*, 484 U.S. 400, 410 (1988)).  "Well-established rules of evidence permit trial judges

17 to exclude evidence if its probative value is outweighed by certain other factors such as

18 unfair prejudice, confusion of the issues, or potential to mislead the jury."  *Holmes*, 547 U.S.

19 at 326.  State rules excluding evidence from criminal trials "do not abridge an accused's

20 right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the

21 purposes they are designed to serve.' "  *Scheffer*, 523 U.S. at 308 (quoting *Rock v.

22 Arkansas*, 483 U.S. 44, 56 (1987)).  "A defendant's interest in presenting ... evidence may

23 thus bow to accommodate other legitimate interest in the criminal trial process."  *Id.*

24 (quotation and citation omitted). When deciding if the exclusion of evidence infringes upon

25 a defendant's rights, a petitioner must show the exclusion "significantly undermined

26 fundamental elements of the accused's defense."  *Id.* at 304.

27 ///

28      To the extent that petitioner asserts that the trial court erred in excluding the

United States District Court

For the Northern District of California

testimony under the California Rules of Evidence, he merely alleges a violation of state law which generally does not entitle him to federal habeas relief.  However, this court must consider the value of the excluded witnesses' evidence in relation to the purposes purportedly served by its exclusion to determine whether a constitutional violation has occurred.  If a violation is found, the error will be analyzed under the harmless error test established in *Brecht* to find whether habeas relief may be warranted.

Here, the trial testimony of Mireles, the victim and principal witness, was inconsistent at points with her previous statements to the police and to medical personnel.  Thus, competent evidence establishing that Mireles had a motive to fabricate may have created a reasonable doubt.  However, petitioner has failed to demonstrate how exclusion of the two witnesses' proposed testimony was material to his defense and violated his constitutional rights.

The trial court's rulings were reasonable and meant to preclude the admission of hearsay and irrelevant evidence under state law.  Villalobos' purported statement would have involved unnecessary review of an ongoing custody case, sexual molestation allegations on the children which likely would result in further inquiry with the victim and the daughters.  The complicated long relationship history between the testifying victim and Villalobos would not exculpate petitioner for the multiple counts for which he was convicted. Regarding the second excluded witness, Moncada, the petitioner has failed to demonstrate that her testimony would have been material to his defense.  Moncada's proffered testimony would have focused on a claim that Moncada attempted to run over the victim with a car and that the court denied her restraining order because the victim presented a witness who could not support the claim.  This denial of the restraining order cannot provide conclusive evidence discrediting the complaining victim's testimony given the facts surrounding this case.

Moreover, there was a great deal of evidence against petitioner.  Officer Lane documented an incident where petitioner violated a restraining order and stole the victim's key.  Officer Rocha documented another incident where petitioner attempted to break into

United States District Court

For the Northern District of California

her apartment.  The September incident, where he tried to kill her by suffocation and strangling is documented by Officer Munoz, Mosher, Canaday, Perez, a 911 call from the neighbor Christina Gonzales, and neighbor Lupe Covarrubias' report of hearing the victim yelling.  Additionally, there were medical reports of the victim receiving treatment at the hospital.  The police were able to recover a knife which had petitioner's fingerprints on it as identified by Officer Graves.  Officers arrived at the apartment hearing a man yelling and a female crying and screaming.  Petitioner opened the door sweating profusely and breathing heavily.  He had blood on his hand and clothing.  Officer Munoz observed the damage and terror that the victim underwent.  The broken cell phone was found in petitioner's pocket, which corroborates that he took her cell phone to prevent her from calling the police.  The circumstances, viewed in the aggregate, show that Mireles' credibility, even if it could be disputed by the excluded witnesses, was not pivotal in the conviction of petitioner and the appellate court's affirming decision.  It was reasonable for the trial court to consider the relevant factors and reasonably determine that the proffered evidence was not significantly impeaching of the victims' critical evidence, and that its minimal probative value with respect to Mireles' credibility was outweighed by an undue risk of unfair prejudice, confusion of the issues, or potential to mislead the jury.  Thus, the state court reasonably concluded that a determination of guilt without the proffered testimony was not arbitrary or disproportionate.

Petitioner cites a five factor balancing test of *Chia v. Cambra*, 360 F.3d 997 (9th Cir. 2004) to argue that his proferred evidence was unreasonably excluded and thus prejudicial. In deciding if the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, the court balances the following five factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Chia*, 360 F.3d at 1004 (citing *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)).  The court must also give due weight to the state interests underlying the state evidentiary rules

United States District Court

For the Northern District of California

1    on which the exclusion was based.  *Id.* at 1006.  But even if the exclusion amounted to

2    constitutional error, the erroneous exclusion of the evidence must have had "a substantial

3    and injurious effect" on the verdict in order to justify federal habeas relief. *Brecht*, 507 U.S.

4    at 623.  Habeas petitioners must therefore establish that the error resulted in "actual"

5    prejudice.  *Id.*

6         The *Chia* balancing test, however, is a creation of circuit law and, consequently, is

7    not "clearly established law" for purposes of habeas corpus review under 28 U.S.C. §

8    2254(d)(1).  *Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009).  Thus, the Ninth Circuit

9    has subsequently found that, absent controlling Supreme Court precedent, a state court's

10   exercise of discretion in excluding evidence pursuant to a valid state evidentiary law will not

11   warrant federal habeas relief.  *Id.* at 758-59.  Here, petitioner's impeachment evidence was

12   excluded under section 352 of the California Evidence Code, a well-established rule of

13   evidence that permits a court to exercise its discretion in admitting testimony. *See* Cal.

14   Evid. Code § 352.  The rule does not, in and of itself, abridge a defendant's right to present

15   a defense.  *Montana*, 518 U.S. at 42.  Because the Supreme Court has not squarely

16   addressed the issue whether a trial court's exercise of its discretion in this context violated

17   a defendant's constitutional right to present a defense, petitioner is not entitled to federal

18   habeas relief.  *Moses*, 555 F.3d at 758-60.

19        Even assuming that the *Chia/Miller* balancing test still applies, the exclusion of the

20   proffered evidence did not deprive petitioner of his constitutional right to present a defense,

21   as it was cumulative of other evidence suggesting Mireles was untruthful about being

22   beaten and battered on multiple occasions.  The proffered evidence, though relevant to

23   Mireles' credibility and petitioner's defense, had limited probative value on this specific

24   issue.  It uniformly involved alleged conduct of which Mireles had not been convicted and

25   depended upon the proffered testimony of other witnesses.  Regarding Villalobos, not only

26   is there a question of whether Mireles made the accusation about being beaten during her

27   marriage, but there is also an issue of whether the daughters, and not Mireles, made the

28   sexual molestation allegations.  As to Moncada, the defense could not show how the denial

United States District Court

For the Northern District of California

1    of a restraining order is conclusive evidence that she lied.  The trial court acted correctly in

2    determining that the limited probative value of the excluded evidence was outweighed by

3    the undue consumption of time the presentation of such evidence and the danger of

4    confusion of the issues to the jury.  *See Scheffer*, 523 U.S. at 314 (noting that "collateral

5    litigation prolongs criminal trials and threatens to distract the jury from its central function of

6    determining guilt or innocence").  In light of the multiple additional witnesses and the fact

7    that petitioner was allowed to cross-examine the witness, the trial court had legitimate

8    concerns that proving Mireles' prior, uncharged conduct would have resulted in two

9    separate trials within this trial on a collateral matter, thus unduly complicating the case.

10        Nor did the proffered evidence have "persuasive assurances of trustworthiness" as

11   was the case in *Chia*, because the statements were not shown to be inherently reliable and

12   trustworthy.  *See Chia*, 360 F.3d at 1004-05.  Furthermore, Villalobos and Moncada's

13   testimony did not constitute a major part of the petitioner's attempted defense as they were

14   not the sole witnesses to refute Mireles' credibility.  Through being allowed to

15   cross-examine Mireles and particularly through Officer Johnson's statement that she was a

16   "liar", petitioner pointed out inconsistencies in Mireles' statement, and argued that those

17   conflicts created reasonable doubt about her credibility.  The record thus reveals that

18   petitioner was able to present a meaningful defense at trial.  Analyzing petitioners' claim

19   under the factors enumerated in *Chia* establishes the state appellate court's decision was

20   not contrary to or an unreasonable application of Supreme Court precedent.  Even if the

21   exclusion was an error, the error was harmless and did not have "a substantial and

22   injurious effect" on the verdict.  Accordingly, petitioner is not entitled to relief on this claim.

23   **II.    Juror Misconduct**

24        Petitioner alleges that there was unauthorized communication between a juror and a

25   defense investigator which prejudiced his case because petitioner compromised his trial

26   tactics as a result.  Petition at 8-10.  Thus, he claims his Sixth Amendment guarantee to an

27   impartial jury was violated.

28        **A.    Standard**

**United States District Court**
For the Northern District of California

1    The Sixth Amendment guarantees to the criminally accused a fair trial  by a panel of

2    impartial jurors.  U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

3    "Even if only one juror is unduly biased or prejudiced, the defendant is denied his

4    constitutional right to an  impartial jury."  *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir.

5    1990) (quotations and citation omitted).

6    "[D]ue process does not require a new trial every time a juror has been placed in a

7    potentially compromising situation."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  Thus,

8    when allegations of juror misconduct or bias arise, the trial court must determine the

9    circumstances, the impact on the jurors, and whether the conduct was prejudicial.  *Remmer*

10    *v. United States*, 347 U.S. 227, 229-30 (1954).

11    "Any unauthorized communication between a juror and a witness or interested party

12    is presumptively prejudicial, but the government may overcome the presumption by making

13    a strong contrary showing."  *Caliendo v. Warden of Calif. Men's Colony*, 365 F.3d 691, 696

14    (9th Cir. 2004).  The Supreme Court recognizes, however, that "it is virtually impossible to

15    shield jurors from every contact or influence that might theoretically affect their vote."  *Id.*

16    (quoting *Smith*, 455 U.S. at 217).  Thus, when the contact is *de minimis*, the defendant

17    must show that the communication could have influenced the verdict before the burden

18    shifts to the prosecution.  *Id.*  When the communication is more than *de minimis*, the

19    burden rests with the government to show that the contact was harmless to the defendant

20    and "there is no reasonable possibility that the communication will influence the verdict."

21    *Id.* at 697; *see Remmer*, 347 U.S. at 229.

22    In determining whether an unauthorized communication raised a risk of tainting the

23    verdict, courts should consider factors such as whether the unauthorized communication

24    concerned the case, the length and nature of  the contact, the identity and role at trial of the

25    parties involved, evidence of actual impact on the juror, and the possibility of eliminating

26    prejudice through a limiting instruction.  *See Caliendo*, 365 F.3d at 697-98.  The trial court

27    is entitled to the presumption of correctness with regard to its determination of juror bias.

28    *Wainwright v. Witt*, 469 U.S. 412, 429 (1985).  As such, a petitioner must produce clear and

United States District Court

For the Northern District of California

1   convincing evidence of a juror's bias. *See Leon v. Yates*, 378 Fed. App'x 755, 757 (9th Cir.

2   2010).

3           This claim was denied without a thoroughly reasoned decision by the state court.

4   When presented with a state-court decision that is unaccompanied by a rationale for its

5   conclusions, a federal court must conduct an independent review of the record to determine

6   whether the state-court decision is objectively unreasonable. *Delgado v. Lewis*, 223 F.3d

7   976, 982 (9th Cir. 2000). This review is not a "de novo review of the constitutional issue";

8   rather, it is the only way a federal court can determine whether a state-court decision is

9   objectively unreasonable where the state court is silent. *Himes v. Thompson*, 336 F.3d

10  848, 853 (9th Cir. 2003).

11          **B.    Analysis**

12          According to petitioner, a juror contacted a defense investigator for Monterey County

13  during the trial and mentioned that if petitioner testified, it might change the outcome of the

14  trial. The juror allegedly told the investigator that the jury was, at the time, leaning towards

15  acquittal because they viewed the whole matter "more [as] a relationship or romantic

16  dispute, and not any more sinister than that." Consequently, the petitioner felt compelled

17  not to testify. Petition at 8-10. Petitioner raised this issue in his motion for a new trial after

18  his conviction and in his state habeas petition.

19          "Conclusory allegations which are not supported by a statement of specific facts do

20  not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994). Here, petitioner

21  has not shown that he is entitled to habeas relief. Petitioner has failed to produce any

22  affidavits from the juror or the investigator to support his claim, nor has petitioner even

23  identified the juror in question. Furthermore, petitioner has failed to present any evidence

24  whatsoever that other jurors were influenced by the incident.

25          At the hearing on the motion for a new trial on December 18, 2007, petitioner did not

26  call any witnesses. The trial court stated that, in reviewing all of the moving papers, it could

27  not find any newly discovered evidence that would justify a new trial or showed any jury

28  misconduct at any time. In denying the new trial motion, the trial court further added that

"there was more than enough evidence to establish the intent necessary for each of the crimes for which the defendant was guilty." Reporter's Transcript at 4807-08. Had petitioner presented a percipient witness to the alleged juror misconduct or any affidavits, his likelihood of showing bias contrary to law would be more probable. However, petitioner did not present any new evidence that would be material to his claim of juror misconduct. At the new trial hearing, the judge considered the probative force of all of the evidence and reasonably concluded that the evidence as a whole was sufficient to sustain the verdict.

Considering that the alleged contact was brief and the lack of evidence of any actual impact on the jurors, it does not appear that the alleged contact raised a reasonable possibility of influencing the verdict. While extrinsic communication between a juror and witness generally may be presumed prejudicial, the trial judge and appellate court reasonably determined the conduct in question did not raise a significant possibility of bias. Petitioner has not otherwise established misconduct nor prejudice. He merely makes conclusory allegations not supported by affidavits or even sufficient factual support and therefore is not entitled to habeas relief.

**III.    Incomplete and Inaccurate Transcripts**

Petitioner contends that his due process rights on appeal were violated because the trial transcripts presented in the record are incomplete and inaccurate. Petition at 11-12.

**A.    Standard**

The Supreme Court has recognized that substantive due process includes access to the courts and also a criminal defendant's right to obtain a trial transcript for purposes of appeal. *Mayer v. Chicago*, 404 U.S. 189, 193-95 (1971). If state law does permit direct appeals of criminal convictions, due process and equal protection require that indigent criminal defendants be provided with free transcripts for use in the appeal, or other effective means of obtaining adequate appellate review. *Britt v. North Carolina*, 404 U.S. 226, 227 (1971); *See Griffin v. Illinois*, 351 U.S. 12, 18-20 (1956) (per curiam). A court need only provide an indigent defendant with a 'record of sufficient completeness' to prepare an appeal; irrelevant or extraneous portions of the transcript may be omitted. *Mayer*, 404 U.S.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

at 194-95 (citation omitted).  Statutes or rules requiring an indigent defendant to show a specific need for an entire trial transcript do not run counter to clearly established federal law.  *See Boyd v. Newland*, 467 F.3d 1139, 1150-51 (9th Cir. 2006).

There is no constitutional right to a totally accurate transcript of a state criminal trial. *Tedford v. Hepting*, 990 F.2d 745, 747 (3d Cir. 1993).  A constitutional violation would occur only if the inaccuracies in the transcript adversely affected appellate review in the state courts.  *Id.*  A petitioner "must point to specific errors alleged to have occurred during the unrecorded portions to support a claim that the absence of a complete transcript resulted in prejudicial error requiring a new trial."  *Bergerco, U.S.A. v. Shipping Corp. of India, Ltd.*, 896 F.2d 1210, 1215 (9th Cir. 1990).  In assessing whether hardship or prejudice results from a trial court's failure to record every statement made in "open court", the reviewing court must consider all the circumstances in the record surrounding the omission.  *United States v. Gallo*, 763 F.2d 1504, 1531 on reh'g in part sub nom.  *United States v. Graewe*, 774 F.2d 106 (6th Cir. 1985).

**B.      Analysis**

Petitioner argues that the court reporter's accuracy was not exemplary and made it difficult to understand what occurred at trial.  Petition at 11.  He notes that words, such as "instruct" and "motions" are misspelled.  *Id.*  He further alleges that there are "a number of places" where events are "simply omitted" including an instance where "trial counsel admitted to his own possible ineffectiveness."  *Id.*

The Monterey County Superior Court rejected petitioner's claim:

"[P]etitioner contends that incomplete and inaccurate transcripts prevent him from presenting a complete and adequate appeal to the state and federal courts.  Petitioner alleges "many events are either misportrayed [sic] or eliminated from the transcripts entirely... Several of these omissions augment and support claims of prejudice and support the argument against the credibility of the complaining witness."  However, petitioner does not provide any specific details about what exactly had been eliminated from the transcripts.  Petitioner's pleading burden is to state with particularity the facts upon which he is relying to justify relief and support the allegations with reasonably available documentary evidence.  (*In re Swain* (1949) 34 Cal. 2d 300, 303-304; *In re Harris* (1993) 5 Cal. 4th 813, 827, fn.5.)  Moreover, habeas relief is not available to secure copies of trial transcripts.

1   Petition, Ex. B at 2.

2        Here, petitioner's rights would be violated if inaccuracies in the transcript adversely

3   affected the outcome of the criminal proceeding.  Since the jury which convicted petitioner

4   acted on the basis of the evidence they saw and heard, rather than on the basis of the

5   written transcript of the trial -which was, of course, non-existent until after the trial was

6   completed-this means that a constitutional violation would occur only if the inaccuracies in

7   the transcript adversely affected appellate review in the state courts.  *See Tedford*, 990

8   F.2d at 747.  The principal question, therefore, is whether petitioner has alleged

9   deficiencies in the trial transcript substantial enough to call into question the validity of the

10  appellate process in the state courts.

11       Petitioner has not shown specific errors to have occurred during the unrecorded

12  portions to support a claim that the absence of a complete transcript resulted in prejudicial

13  error requiring a new trial.  To the extent of noting the misspelled words, petitioner has not

14  otherwise shown substantial deficiencies of the transcript.  He has failed to plead and

15  support the allegations as to when the omitted events occurred, including the instance of

16  trial counsel's alleged admission of ineffectiveness.  As mentioned above, conclusory

17  allegations which are not supported by specific facts do not warrant habeas relief.  *See*

18  *James v. Borg*, 24 F.3d at 26.

19       In order to demonstrate denial of a fair appeal, petitioner must show prejudice

20  resulting from the missing or incomplete transcript.  *Bransford v. Brown*, 806 F.2d 83, 86

21  (6th Cir. 1986).  'Gross speculation' that the missing portions of the transcript reflect

22  reversible error is not enough to show the trial court's determination was clearly erroneous.

23  *Id.*;  *See United States. v. Anzalone*, 886 F.2d at 232.  Instead, petitioner must present

24  "some modicum of evidence [to] support such a conclusion."  *Id.*  Petitioner has not met his

25  burden in this case.  The record is clear that the full transcript of the trial was presented to

26  the state appellate courts and petitioner has not produced any evidence, other than "gross

27  speculation," to support his claim that the transcripts prevented him from presenting a

28  complete and adequate appeal.  Petitioner is not entitled to habeas relief on this claim.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

## IV.   Ineffective Assistance of Trial and Appellate Counsel

Petitioner next contends that trial and appellate counsel rendered ineffective assistance for failing to raise arguable issue in their respective proceedings.

### A.   Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687–88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*  In other words, where the defendant is challenging his conviction, the appropriate question asks if there is a reasonable probability that, "absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

The Strickland prejudice analysis is complete in itself.  Therefore, there is no need for additional harmless error review pursuant to *Brecht v. Abrahamson. Avila v. Galaza*, 297 F.3d 911, 918 n. 7 (9th Cir. 2002).  It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the Strickland test if the petitioner cannot even establish the first prong. *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).  Similarly, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the

United States District Court

For the Northern District of California

1  alleged deficiencies.  *Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470

2  & n. 3 (9th Cir. 1995) (noting with approval district court's refusal to consider whether

3  counsel's conduct was deficient after determining petitioner could not establish prejudice).

4      The Strickland framework for analyzing ineffective assistance of counsel claims is

5  "clearly established Federal law, as determined by the Supreme Court of the United States"

6  for the purposes of 28 U.S.C. § 2254(d) analysis.  *Williams v. Taylor*, 529 U.S. at 405–07.

7  On habeas review, applying § 2254(d), "the question is not whether counsel's actions were

8  reasonable.  The question is whether there is any reasonable argument that counsel

9  satisfied *Strickland's* deferential standard."  *Harrington*, 131 S. Ct. at 788.  "There is a

10  'strong presumption' that counsel's attention to certain issues to the exclusion of others

11  reflects trial tactics rather than 'sheer neglect.'"  *Id.* at 790.  "If the state court's rejection of

12  either element of Petitioner's claim was reasonable, habeas relief is not available, because

13  the Supreme Court requires that both elements be present to prevail."  *Brodit v. Cambra*,

14  350 F.3d 985, 992 (9th Cir. 2003).

15      **B.     Analysis**

16      Petitioner alleges three instances of counsel ineffectiveness at trial.  First, he claims

17  that trial counsel failed to investigate before the trial or follow up on the leads provided by

18  petitioner.  Second, he claims that trial counsel failed to discover and bring forth mitigating

19  evidence.  Lastly, he notes a failure of trial counsel to object to a statement made by Jalane

20  Hogue, the District Attorney's investigator.  Petition at 13-18.  Petitioner argues appellate

21  counsel was ineffective for failing to raise the above claims regarding trial counsel.  The

22  Monterey County Superior Court rejected petitioner's claim:

23      Third, petitioner contends trial and appellate counsel rendered ineffective
       assistance. Petitioner alleges trial counsel failed to strenuously object to the
24      trial court's ruling to exclude two key witnesses whose testimony would have
       attacked the credibility of the victim and failed to investigate other leads
25      petitioner provided regarding the victim's credibility.  Petitioner alleges
       appellate counsel rendered ineffective assistance for failing to raise the above
26      issues on appeal.

27      To prevail on a claim of ineffective assistance of counsel, petitioner must
       show that: (1) counsel's performance fell below an objective standard of
28      reasonableness under prevailing professional norms and (2) there is a

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

reasonable probability that but for counsel's errors, the result would have been different (i.e. there must be a showing of prejudice.) (*Strickland v. Washington* (1984) 466 U.S. 668; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) A court may first determine the existence of prejudice, if any, and "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice" in the court's discretion. (*Strickland v. Washington*, *supra*, at 697.)

The issue petitioner took up on appeal was that the trial court erroneously precluded him from presenting two witnesses who would have offered testimony challenging the credibility of the victim. The appellate court held the trial court did not abuse its discretion, and even assuming the trial court erred, the error was harmless. (Petition, Exhibit A, *People v. Juan Mendez*, H032453.) Under these circumstances, the court finds petitioner cannot meet his burden.

Whether trial counsel failed to investigate leads was a claim petitioner raised in his unsuccessful motion for a new trial and which should have been raised on appeal. *Dixon*, *supra*, 41 Cal.2d 756.

Finally, petitioner has failed to meet his burden that under *Strickland* that appellate counsel was ineffective for failing to raise all of the above issues is a claim which also fails.

Petition, Ex. B at 2-3.

### 1.    Ineffective Assistance of Trial Counsel

### i.    Failure to Investigate

Petitioner contends that trial counsel was ineffective for failing to learn more about Mireles' previous false accusations and false statements. According to petitioner, he knew Mireles made false statements to gain custody of her children and deprive Villalobos custody because he helped her. Petition at 13-14. Petitioner alleges a pattern of dishonest behavior due to him knowing why she allegedly lied in the past about violence against her. He contends that trial counsel should have examined records where Mireles made false statements.

Yet, as discussed above, trial counsel did attempt to have witnesses testify regarding Mireles' credibility and counsel of course attempted to impeach Mireles through cross-examination and pointing out inconsistencies. Reporter's Transcript at 2469-2475. Mere speculation that other unidentified witnesses or records might have given helpful information if interviewed or obtained is not enough to establish ineffective assistance to the extent petitioner argues there was additional information. *Bragg v. Galaza*, 242 F.3d

United States District Court

For the Northern District of California

1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001).

Here, nothing petitioner cites in regards to the two excluded witnesses provides any indication what additional supporting facts witnesses would have provided and how it would have assisted petitioner.  Petitioner's unsupported allegations are insufficient to establish either deficient performance by counsel or prejudice.  This claim is without merit.

### ii.    Duty to Mitigate

Petitioner contends that trial counsel failed to discover and bring forth mitigating evidence regarding an incident between Mireles and Nayeli Martinez to impeach Mireles' credibility.  Specifically, he asked counsel to subpoena police reports about an incident between Mireles and Martinez, where Mireles accused Martinez of battery, but allegedly Mireles intentionally injured herself to report it to the police and implicate Martinez.  Petition at 15-16.  No charges were brought and petitioner has not presented a copy of the alleged report to this or any court.

A lawyer must make reasonable efforts, considering all the circumstances, to meet standards of 'reasonable professional judgment'.  *Rompilla v. Beard*, 545 U.S. 374, 396 (2005).  It is well settled that whether and how to present evidence is a matter of trial tactics. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).  Tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics are known to have been available.  *Id.*  Furthermore, a mere difference of opinion as to trial tactics does not constitute denial of effective assistance. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981).  "[I]n applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made[.]" *Rompilla*, 545 U.S. at 381.  "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*,  131 S. Ct. at 789.

Here, as in *Rompilla*, petitioner urges that counsel was ineffective because he should have obtained and reviewed evidence of mitigating circumstances.  That counsel failed to obtain a police report regarding a prior incident and records that at the time were

**United States District Court**
For the Northern District of California

1   highly suggestive and speculative suggesting Mireles lied before, fails to demonstrate

2   ineffective assistance of counsel.  Nor does petitioner provide sufficient details about the

3   incident.  The state court reasonably found that counsel refused to pursue a line of

4   investigation because he did not believe the tale.  Although petitioner wanted to paint

5   Mireles as a liar and a manipulator to discredit her as a chief witness, neutral witnesses

6   described her as a battered, bloody, and bruised victim.  Reporter's Transcript at 1523-

7   1538, 1541-1550, 2223-2232.  It is also possible that, at the time, counsel decided he had

8   enough evidence to attack her credibility by eliciting contradictory testimony from Mireles

9   on cross-examination.  *Id.* at 2469-2475.  Counsel's choice was a tactical decision and

10  should be immune from attack under *Strickland*.  *Gerlaugh v. Stewart*, 129 F.3d 1027, 1033

11  (9th Cir. 1997).  Even if petitioner could show that counsel did not meet standards of

12  'reasonable professional judgment', his argument still fails because petitioner has not

13  provided the report, and therefore has not met his burden to establish prejudice.  This claim

14  is denied.

15              **iii.      Failure to Object to Erroneous Testimony**

16          Petitioner contends that his trial counsel was ineffective because he did not object to

17  conflicting testimony given by a prosecution witness, Jalane Hogue.  He complains that a

18  statement of whether Mireles lost consciousness, conflicted with written reports by Hogue,

19  and that he wanted counsel to object or make some statement about the conflict.  Petition

20  at 16.

21          As stated above, much deference must be given to counsel's decisions at the time

22  he made them.  Here, counsel formulated a strategy that was reasonable at the time and in

23  accord with effective trial tactics and strategies.  The United States Supreme Court has

24  never required defense counsel to pursue every nonfrivolous claim or defense, regardless

25  of its merit, viability, or realistic chance of success.  *Knowles v. Mirzayance*, 556 U.S. 111,

26  123-27 (2009).  It was undisputed that Mireles was beaten, bloody, and poked with a knife.

27  Thus, whether she lost consciousness was not a vital fact and it is possible and reasonable

28  that counsel did not want to spend extra time focusing on the injuries.  Therefore, counsel's

United States District Court

For the Northern District of California

1  failure to object to the conflicting testimony did not prejudice petitioner.  Thus, the state

2  appellate courts' rejection of this claim was not contrary to, or an unreasonable application

3  of, clearly established federal law.

4        **2.     Ineffective Assistance of Appellate Counsel**

5        Regarding ineffective assistance of appellate counsel, petitioner contends that

6  counsel failed to raise three of the four issues mentioned in the petition: (1) the

7  unauthorized communication between juror and investigator; (2) the incomplete and

8  inaccurate trial transcripts; and (3) ineffective assistance of trial counsel.  Petition at 19-20.

9         The *Strickland* test is also used on claims of ineffective assistance by appellate

10  counsel.  *See Smith v. Murray*, 477 U.S. 527, 536 (1986); *see also Smith v. Robbins*, 528

11  U.S. 259, 285-86 (2000) ("the proper standard for evaluating [a petitioner's] claim that

12  appellate counsel was ineffective ... is that enunciated in Strickland" ).

13        As discussed above, none of petitioner's claims have merit.  Therefore, appellate

14  counsel was not ineffective for failing to raise them.  *See Turner v. Calderon*, 281 F.3d 851,

15  872 (9th Cir. 2002) ("[A]ppellate counsel was not ineffective for failing to raise [a] meritless

16  claim.");  *Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991) ("[P]etitioner was not

17  prejudiced by appellate counsel's decision not to raise issues that had no merit.")  Petitioner

18  has failed to demonstrate any unreasonable application of established Supreme Court

19  authority and this claim is denied.

20                          **CONCLUSION**

21        For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.  The

22  clerk shall close the file.

23                    **Certificate of Appealability**

24        To obtain a COA, petitioner must make "a substantial showing of the denial of a

25  constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the

26  constitutional claims on the merits, the showing required to satisfy § 2253(c) is

27  straightforward:  The petitioner must demonstrate that reasonable jurists would find the

28  district court's assessment of the constitutional claims debatable or wrong."  *See Slack v.*

29

1  *McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA

2  to indicate which issues satisfy the COA standard.  Here, the court finds that two issues

3  presented by petitioner in his petition meet the above standard and accordingly GRANTS

4  the COA as to those issues.  *See generally Miller–El v. Cockrell*, 537 U.S. at 322.  Those

5  issues are:

6       (1) whether the trial court's exclusion of testimony from two witnesses violated

7  petitioner's right to present a complete defense; and

8       (2) whether petitioner's trial and appellate counsel were ineffective under *Strickland*

9  *v. Washington*, 466 U.S. 668 (1984).

10      Accordingly, the clerk shall forward the file, including a copy of this order, to the

11  Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270

12  (9th Cir. 1997).

13  **IT IS SO ORDERED.**

14  Dated: March 6, 2013       _____

15                             PHYLLIS J. HAMILTON
                               United States District Judge

16

17  G:\PRO-SE\PJH\HC.10\Mendez5555.rul.wpd

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California